NOT DESIGNATED FOR PUBLICATION

No. 116,831

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

EDWARD LEO RUGGIERO,
*Appellant*.

MEMORANDUM OPINION

Appeal from Butler District Court; JANETTE L. SATTERFIELD, judge. Opinion filed May 25, 2018. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Brett D. Sweeney*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN, J., and HEBERT, S.J.

PER CURIAM: After a two-day trial in Butler County, a jury convicted Edward Leo Ruggiero of one count of driving under the influence (DUI) of alcohol or drugs. He was sentenced to 12 months' probation with an underlying 12-month prison sentence. On appeal, Ruggiero argues that insufficient evidence existed to support his conviction because the evidence did not show he was impaired to the extent that he could not drive safely. For reasons discussed later, we conclude a reasonable jury could find that he was guilty beyond a reasonable doubt of DUI. As a result, we affirm.

1

On November 3, 2013, around 2 p.m., Ruggiero was involved in a vehicular collision in Douglass, Kansas. Ruggiero's 2002 Dodge truck collided with a legally parked 2013 Ford pickup. The force of the collision tore off a front wheel of Ruggiero's truck. The truck then traveled through a front yard and then crashed into a house. Alan Butcher, the owner of the 2013 Ford pickup was watching a Chiefs' football game on his television when the collision occurred. When he went outside, Butcher saw that the back end of his truck had been damaged. Moreover, he also saw that Ruggiero's truck had ended up in the front yard of a house across the street. He walked over to Ruggiero and asked him if he was alright. Brian Little, the owner of the house, also came outside and saw the damage to his yard and house; he then walked over to Ruggiero to make sure he was alright and to tell him to stay where he was. Both Butcher and Little saw that Ruggiero was bleeding from his head and he seemed to be "out of it." Moreover, they noticed that his speech seemed to be slow. Eventually, Butler County Deputy Sheriff Thomas Gresham and emergency medical services (EMS) arrived at the collision.

As a result of the collision, the State later charged Ruggiero with DUI. Ruggiero pled not guilty to the DUI charge.

At trial, the State presented testimony from several witnesses and also admitted several exhibits, including the lab results of Ruggiero's blood test and photos of the collision scene. Ruggiero provided the jury with a list of all the medications he had been prescribed since 2008.

Deputy Sheriff Gresham was the first to testify at trial. He described the scene of the collision and the extensive damage done to both trucks and the house. He testified that the speed limit of the residential neighborhood was 25 mph but made no inference as to the speed Ruggiero was traveling when he slammed into Butcher's parked truck. Deputy Sheriff Gresham also testified that when he walked up to Ruggiero, he noticed that "[t]he defendant had some blood on his face . . . and . . . a small cut above the right

2

eye . . . [and] the entire right side of his face, the cheek, the forehead, around the eye and around the mouth was swelling." When asked by defense counsel about his experience with car accidents in which a person receives a head injury, Deputy Sheriff Gresham agreed that such injuries could cause an individual to have slurred speech and to have a lack of balance. Furthermore, Deputy Sheriff Gresham also agreed that EMS had taken Ruggiero from the scene particularly quickly due to his lack of balance and head injury.

According to Deputy Sheriff Gresham, Ruggiero explained that he was driving a few blocks from his home when "his identification badge had fallen somewhere in his truck onto the floor; that he reached down to grab it and struck the truck in the process of doing that." Deputy Sheriff Gresham saw that Ruggiero had his boots on the wrong feet and that Ruggiero "had some slurred speech that [Sheriff Gresham] knew not to be normal for him" because of his previous interaction with Ruggiero. When asked by Deputy Sheriff Gresham for medical information he could give to the medical attendant, Samantha Harris, Ruggiero's fiancée, told Deputy Sheriff Gresham that Ruggiero "was on the second day of taking a new antidepressant that caused his speech to be slurred." She also listed a number of other medications Ruggiero was taking around that time. Deputy Sheriff Gresham eventually requested a blood draw be done on Ruggiero. In explaining this decision, Deputy Sheriff Gresham stated:

> "Due to the things that I observed on scene. Primarily his shoes being on backwards and cinched up tight. And his slurred speech. The knowledge that he took several medications, some of which were for pain and for depression. And the fact that the accident had occurred. And at that time what I believed to be the severity of his injuries with him, for lack of better term, slipping in and out of consciousness. I requested the blood dr[a]w for those reasons."

Trooper Aaron McGuire of the Kansas Highway Patrol was asked to obtain the blood sample. Trooper McGuire drove to the hospital and read the implied consent advisories to Ruggiero while he was on a stretcher and left a copy of the advisories on his

3

leg. Ruggiero was unconscious or semiconscious when the implied consent notice was read to him by Trooper McGuire. Trooper McGuire asked that one of the medical personnel draw the blood. The blood draw was completed around 3 p.m. The blood sample was sent to the Kansas Bureau of Investigation (KBI) laboratory where it was tested by forensic scientist, Gretchen Crow.

Crow has a Bachelor of Science degree in chemistry and was working for the KBI as a forensic toxicologist when Ruggiero's blood sample arrived for testing. Crow testified about her lab report, which was properly admitted into evidence. The report showed that Ruggiero tested positive for the presence of Lorazepam, Methocarbamol, Guaifenesin, Tramadol, N-Desmethyltramadol, Venlafaxine, Desmethylvenlafaxine, Sertraline, and Ibuprofen. Crow testified that Lorazepam is a central nervous system (CNS) depressant used as an antianxiety or sedative drug. Adverse effects of Lorazepam can be "sedation, dizziness, weakness and poor coordination." Methocarbamol is also a CNS depressant and muscle relaxant. Guaifenesin is a benign metabolite of Methocarbamol and does not cause impairment. Tramadol is an analgesic used to treat pain and may cause dizziness. N-Desmethyltramadol is a metabolite of Tramadol and does not cause impairment. Venlafaxine is an antidepressant and does not alone cause driving impairment, but with other CNS depressants may increase the risk for impairment. Desmethylvenlafaxine is a metabolite of Venlafaxine and does not cause impairment. Sertraline is an antidepressant that may cause dizziness which can be accentuated if taken with other CNS depressants. Ibuprofen is an over-the-counter painkiller.

Importantly, Crow testified that no quantitative data was listed in her lab report. She explained that this is because there is no presumptive level of impairment unlike, for example, the statutorily presumptive impairment level of .08 for alcohol consumption. She further explained: "If [the KBI] did quantitate drugs it would be for clinical purposes only to see whether someone's at a sub therapeutic, therapeutic, toxic or lethal dose."

Throughout Crow's testimony, she explained only the possible effect each drug had on the average human body but did not testify as to how the drug affected Ruggiero individually. Specifically, she stated: "These are just in general what the drugs can do." Crow could not say if the levels of substances in Ruggiero's blood influenced him to the extent that he could not drive safely. Additionally, she could not say whether the levels of the drugs in Ruggiero's system were therapeutic or less than therapeutic.

The State also called Butcher to testify. Butcher testified that after hearing a noise, he went outside and saw that his truck had been pushed about 10 feet from where it was originally parked. He immediately saw that the tailgate end of the truck had been damaged. Butcher testified that when he reached Ruggiero, he was "pretty much out of it" and was bleeding from his forehead. He stated that Ruggiero was "[t]ired a little bit, but he was kind of—he was out of it. Like he was either knocked out or I mean there was something." When pressed by the State, Butcher explained that he believed Ruggiero had a head injury. Similar to Deputy Sheriff Gresham, Butcher testified that Ruggiero told him that the collision was caused by reaching to the truck's floorboard for his fallen employee ID badge.

After Butcher, Little testified as to what he saw concerning the collision. Little described the scene and the damage to his property. When he saw the damage, Little described being "really scared that whoever was driving was going to be in a really, really bad shape or dead." Little further explained that Ruggiero "had a cut above . . . his left eye . . . he was talking kind of slow . . . [and] he had his boots on the wrong feet." Little also told the jury that the boots were laced and tied tightly. Little also testified that Ruggiero asked Little to take his holstered gun on his hip from him. Little then put the gun in the back of Ruggiero's truck.

Little's wife, Royann Little, testified that she thought Ruggiero had asked that the gun be taken from him to make everyone "aware [t]hat it was there and so there wasn't

5

any problems." She gave a similar physical description of the damage as her husband did and explained that she was concerned Ruggiero may have been drinking but did not smell alcohol. She corroborated her husband's testimony that Ruggiero's boots were on the wrong feet and tightly laced. Moreover, she told the officers at the scene she thought that was odd.

The State also called Harris, Ruggiero's fiancée, to testify. Harris was at work passing out medications as a nurse at a nursing home on the day of the collision. Harris told the jury that Deputy Sheriff Gresham was incorrect when he testified that she told him that Ruggiero's speech was slurred because of new medication he was taking. She further testified that Ruggiero had been taking his prescribed medications for a while and tolerated them well.

Ruggiero testified in his own defense. He told the jury that he lived about five houses from the collision and he was leaving town to visit his family the day of the collision. In explaining his reason for the collision, Ruggiero stated:

> "I have a little cutout on the dashboard where you could put your cell phones or whatever.
>
> "And had my phone in there. The phone rang . . . . I pulled my phone out of that little cubby hole. That's where I keep my ID for work. It fell on the floor. And with my phone still in my hand I just bent over to pick it up and that's the last thing I remember."

He testified that upon waking up from the accident, he was in a driveway up against a house and was confused as to how he got there. He then spoke with the owner of the house and handed him his gun. He remembered telling the people who ran to check on him that he had picked up his ID badge when the collision occurred. He then told the same version to Deputy Sheriff Gresham. He walked around the vehicle until Deputy Sheriff Gresham told him to get back in the truck.

Ruggiero testified that he still takes several medications that were prescribed to him after his four military tours in Iraq. The medications are prescribed for his anxiety, panic attacks, depression, and chronic injuries. Ruggiero further testified that he did not take Lorazepam the day of the accident. He also stated that he had "no doubt whatsoever" in his confidence to drive safely that day. Ruggiero stated that, in the past, he has discontinued use of any drugs that he did not tolerate very well.

Defense counsel asked Ruggiero before trial to put the boots he wore on the day of the collision on the wrong feet. In his testimony, Ruggiero stated that "[t]hey wouldn't go on. They were painful and uncomfortable." He further stated that he would have noticed immediately if the boots had been put on the wrong feet and denied that they were on the wrong feet the day of the collision.

After deliberating for about two hours, the jury found Ruggiero guilty of DUI.

*Was Ruggiero's Conviction Supported By Sufficient Evidence?*

The only issue Ruggiero argues on appeal is that there was insufficient evidence presented at trial to support a conviction of driving under the influence of drugs.

"'When the sufficiency of evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). "'In making a sufficiency determination, the appellate court does not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility. [Citations omitted.]'" *State v. Dunn*, 304 Kan. 773, 822, 375 P.3d 332 (2016). A guilty verdict will be reversed only in rare cases where the testimony is so incredible that no reasonable

7

fact-finder could find the defendant guilty beyond a reasonable doubt. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

Ruggiero was convicted of DUI under K.S.A. 2013 Supp. 8-1567(a)(3) which states:  "Driving under the influence is operating or attempting to operate any vehicle while . . . under the influence of any drug or combination of drugs *to a degree that renders the person incapable of safely driving a vehicle*." (Emphasis added.) Ruggiero argues that the State failed to prove that he was under the influence of a drug or drugs to the extent that he was incapable of safely driving a vehicle beyond a reasonable doubt.

"[A] DUI conviction, like any conviction, can be supported by direct or circumstantial evidence." *State v. Perkins*, 296 Kan. 162, 167, 290 P.3d 636 (2012). "Circumstantial evidence may support a conviction, if such evidence provides a basis from which a reasonable factfinder may reasonably infer the existence of the fact in issue." *State v. Darrow*, No. 109,397, 2014 WL 1887629, at *2 (Kan. App. 2014) (unpublished opinion), *aff'd* 304 Kan. 710, 716, 374 P.3d 673 (2016).

The physical facts, which no one disputes, showed that the crash happened during daylight on a residential street where the speed limit was 25 mph. In addition, on the day of the collision, there was no rain, no reduced visibility, or no physical obstructions in the street. Moreover, the street was a paved surface. The physical facts further showed that Ruggiero slammed his truck into the rear end of Butcher's legally parked truck with such force that Ruggiero completely knocked off one of the front wheels to his truck. Even after colliding into Butcher's truck, Ruggiero's truck still had enough energy to travel through Brian and Royann Little's front yard. It dug a trench as it went through their yard, and his truck eventually slammed into the garage door of their home, damaging Royann's car that was parked inside the garage.

8

Ruggiero's only explanation for the collision was that he was a few blocks from his home when he fumbled and dropped his employee ID badge to the floor of his truck and, when he bent down to retrieve his ID badge, he slammed his truck into the rear end of Butcher's truck. He paraded these facts before the jury in assigning a complete explanation as to the cause for the collision.

Nevertheless, Deputy Sheriff Gresham witnessed and testified to Ruggiero's obvious signs of impairment on the day of the collision. Deputy Sheriff Gresham immediately noticed Ruggiero's slurred speech. He knew Ruggiero's speech was slurred because he was familiar with Ruggiero's regular speech based on previous interactions with him. Harris also conceded that Ruggiero's newest medication had been causing him to have slurred speech. This concession further undercuts Ruggiero's argument that any trauma to his head during the collision caused his slurred speech. Moreover, he saw that Ruggiero was wearing his boots, tightly laced, on the wrong feet. Brian and Royann Little also testified they saw that Ruggiero was wearing his boots, tightly laced, on the wrong feet.

In addition, the State introduced expert testimony as to pharmacological properties of drugs in Ruggiero's system. Although the forensic scientist could not say if any of the drugs she found in Ruggiero's system could have impaired his ability to safely drive, she testified that she found the drug Lorazepam in his blood. She testified that this drug is used as a sedative and as an antianxiety medication. She further testified that Lorazepam can cause dizziness, weakness, and poor coordination. She also testified that Methocarbamol, a muscle relaxer, and Tramadol, an analgesic and a central nervous system depressant, were found in Ruggiero's system. Methocarbamol can cause dizziness, drowsiness, and light headedness. Tramadol can cause dizziness.

9

Finally, based on Ruggiero's own testimony as to the cause of the collision, he has conceded the fact that he was clearly distracted by something before the collision occurred.

When reviewing the previously described evidence of impairment, Ruggiero disputes only the evidence that his boots were on the wrong feet when the collision occurred. Indeed, Ruggiero testified that he tried to put the boots that he wore on the day of the collision on his wrong feet before trial, but "[t]hey wouldn't go on. They were painful and uncomfortable." One must ask this question: What would be the motive of three disinterested witnesses to each *falsely* or *mistakenly* testify that Ruggiero was wearing his boots on the wrong feet the day of the collision? The record is devoid of any motive for them to do so. Moreover, the testimony of a disinterested witness, all things being equal, is preferred to that of an interested witness.

Here, the fact that Ruggiero was wearing his boots on the wrong feet impressed itself upon the memory of Deputy Sheriff Gresham, Brian Little, and Royann Little because it was unusual. Indeed, it impressed itself upon Royann's memory so much so she shared with the other law enforcement officers at the scene that she thought it was *odd* that Ruggiero was wearing his boots on the wrong feet.

Ruggiero's complete denial that he was wearing his boots on the wrong feet presented the jurors with a conundrum over who they believed: Ruggiero or the three disinterested witnesses. While passing on the credibility of witnesses and the weight of the evidence produced, the jurors were free to believe all, part, or none of the evidence. Quite clearly the jury did not believe Ruggiero with respect to his explanation as to what caused the collision. Indeed, if the jury did not believe Ruggiero's explanation for the collision, his explanation would have been valueless in the eyes of the jurors in explaining a satisfactory cause for the collision. Thus, the jury would have been left with only the undisputed facts, previously described, surrounding the collision. When those

10

facts are viewed in the light most favorable to the State, a rational fact-finder could have found Ruggiero guilty beyond a reasonable doubt of DUI.

Affirmed.

\* \* \*

ARNOLD-BURGER, C.J., dissenting: I respectfully dissent. I do not believe there was sufficient evidence when viewed in the light most favorable to the State from which a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). The majority has done an excellent job of setting forth the facts so I will not restate them here except to summarize the sum total of evidence against him in a few short sentences.

Edward Leo Ruggiero collided with a parked car. He suffered a serious head injury that required he be rushed to the hospital, frequently lapsing in and out of consciousness. When he was conscious, his speech was slurred and he seemed confused. His boots were laced up on the wrong feet. A blood test indicated that he had drugs in his system. But the State was unable to present any evidence regarding the quantity of drugs in his system and the effect it would have had on him. How could one possibly conclude beyond a reasonable doubt from such minimal evidence that Ruggiero was under the influence of drugs to the extent that he was incapable of safely operating his vehicle? That was what the State was required to prove beyond a reasonable doubt. The State presented no evidence about the quantity of drugs in his system. We do not know if it was equal to, less than, or more than a therapeutic dose. We do not know if it was more than a trace amount, only that it was a detectable amount. No one alleges that he was illegally taking any of the drugs noted in his system. The only piece of evidence that could not be equally explained by a serious head injury was the fact that his boots were on the wrong feet. None of the State's witnesses could separate the effects of a head injury from the

11

effects of drug use. Nor because of the lack of evidence of the quantity of drugs in his system, could anyone conclude that it was his drug use that affected his driving. I simply do not find that this is even a close call. I would reverse the conviction as unsupported by the evidence.